UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


GRACIELA R. ESQUIVEL,

      Plaintiff,

v.                                                                                                  No. SA-19-CV-00143-JKP

CORECIVIC, INC.; JOSIE
BAYREAUX, INDIVIDUALLY; AND
JOSE RODRIGUEZ, INDIVIDUALLY;

      Defendants.


## MEMORANDUM OPINION AND ORDER

Before the Court are *Defendants' CoreCivic, Inc., Josie Bayreaux, and Jose Rodriguez's Motion for Summary Judgment*, ECF No. 15, to which Plaintiff responded, ECF No. 20, and Defendants replied, ECF No. 22, and *Defendants' Objections to Plaintiff's Evidence in Response to Defendants' Motion for Summary Judgment*, ECF No. 23, to which Plaintiff responded, ECF No. 25. Upon consideration of the briefs, evidence, and the arguments presented at a hearing convened December 1, 2020, the Court concludes the objections shall be sustained in part and overruled in part and the motion for summary judgment shall be granted.

### I. BACKGROUND

CoreCivic, Inc. ("CoreCivic") maintains a contract with the United States Immigration and Customs Enforcement Agency to operate the South Texas Family Residential Center in Dilley, Texas for immigrant women and children. Plaintiff joined CoreCivic as a Resident Supervisor on May 4, 2015.

The majority of Plaintiff's tenure with CoreCivic was spent in the intake department. Plaintiff suffered an illness in the spring of 2017. She applied for and received approval to take Family Medical Leave Act ("FMLA") leave from June 23, 2017 through August 1, 2017, extended to September 29, 2017. When Plaintiff returned to work, she was not reinstated to her post in intake but assigned to various other posts including recreation, housing, and the "Rover" position.

Plaintiff injured her shoulder and neck at work on November 2, 2017. She initiated a claim for workers' compensation and her physician placed her under reaching and lifting restrictions. Despite knowing about Plaintiff's injury, the restrictions, and that she was in pain, her supervisors ordered her to do tasks that aggravated her injury.

In mid-November 2017, Plaintiff filed multiple internal complaints in which she detailed her removal from intake, identified conduct by her supervisor she found objectionable, expressed her distress about her work situation, and asked for help resolving the issues. These internal complaints were not acknowledged, addressed, or resolved by CoreCivic prior to Plaintiff's resignation on December 4, 2017.

After completing the required administrative procedures, Plaintiff filed this action on January 10, 2019, in the 218th District Court, Frio County, Texas. Defendants removed the action to federal court on February 15, 2019. Plaintiff's Original Petition, ECF No. 1-1, is the operative pleading. Plaintiff brings claims for retaliation in violation of the Texas Labor Code and for retaliation and interference in violation of the FMLA. On March 23, 2020, Defendants filed the motion for summary judgment now before the Court. Having heard the arguments of the parties at a hearing convened December 1, 2020, the motion is ripe for ruling. Defendants move for summary judgment on all of Plaintiff's claims.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[1] A dispute is "genuine" where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249. A dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Id*. at 248. While all evidence and reasonable inferences are viewed in the light most favorable to the nonmovant, and all disputed facts are resolved in favor of the nonmovant, the judge's function "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine [dispute] for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249); *see also Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

The moving party has the burden to "demonstrate the absence of a genuine [dispute] of material fact and the appropriateness of judgment as a matter of law" to prevail on its motion. *Union Planters Nat'l Leasing v. Woods*, 687 F.2d 117, 121 (5th Cir. 1982). Once the moving party has met its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 (stating that "a scintilla of evidence" is insufficient). Rather, the nonmoving party must identify specific facts that show a genuine dispute for trial. *Matsushita*, 475 U.S. at 587.

---

[1] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute] of material fact." *Anderson*, 477 U.S. at 247-48. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita*, 475 U.S. at 586-87).

## III. DISCUSSION

### A. Objections

Defendants object to paragraphs two, four, and six of Plaintiff's Declaration. Defendants contend the paragraphs contradict Plaintiff's previous sworn deposition testimony and ask the Court to disregard the paragraphs because Plaintiff provides no explanation for the contradictions. Plaintiff responds that she was the first to be deposed. After reviewing the later depositions of Josie Bayreaux ("Bayreaux") and Jose Rodriguez ("Rodriguez") she was able to clarify, and not contradict, some of her recollections in her Declaration.

A party may not "defeat a motion for summary judgment using an affidavit that impeaches without explanation sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (citations omitted). But, "[w]hen an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine [disputes] in a motion for summary judgment." *Id.* at 496 (citing *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988)). "Permissible supplementation includes providing

'greater detail or additional facts not previously provided in the deposition.'" *McArdle v. Dell Prods.*, L.P., 293 Fed. App'x 331, 335 (5th Cir. 2008) (quoting *S.W.S. Erectors*, 72 F.3d at 496).

At the December 1, 2020 hearing, the parties agreed that paragraph two of Plaintiff's Declaration clarified the timeline regarding whether Plaintiff was assigned to pull weeds before she took FMLA leave, after her FMLA leave, or both. Accordingly, Defendants' objections to paragraph two are moot. The objections to paragraph four are sustained to the extent that the Court strikes "Chapa" and "Bayreaux" from Plaintiff's Declaration. The objection to paragraph six is sustained. Plaintiff did not explain the discrepancy in her response and the Court found no support in the record for the statement in paragraph six to which Defendants objected.

**B. Retaliation**

An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). Under the Texas Labor Code, "[a] person may not discharge or in any other manner discriminate against an employee because the employee has. . . filed a worker's compensation claim in good faith[.]" Tex. Lab. Code § 451.001(1).

Courts analyze FMLA and Texas Labor Code retaliation claims under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Wheat v. Fla. Parish Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (FMLA); *Parker v. Valerus Compression Servs., LP*, 365 S.W.3d 61, 66 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (Tex. Lab. Code § 451.001).

Under *McDonnell Douglas*, a plaintiff must first make a prima facie case. A plaintiff makes a prima facie case of retaliation by showing: (1) the plaintiff engaged in protected activity; (2) an adverse employment action occurred; and (3) there was a causal connection

between the protected activity and the adverse employment action. If the plaintiff succeeds in making a prima facie case, the burden shifts to the defendant to articulate a legitimate nonretaliatory reason for the adverse employment action. Once the defendant has done so, "the plaintiff must raise an issue of material fact that the employer's proffered reason was pretextual." *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017) (citing *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016)) (FMLA); *West v. Maintenance Tool and Supply Co., Inc.*, 89 S.W.3d 96, 105 (Tex. App.—Corpus Christi [13th Dist.] 2002, no pet.) (§ 451.001) ("Only after the employer's summary judgment evidence establishes a legitimate, non-discriminatory reason for the discharge is the employee required to come forward with summary judgment evidence of a retaliatory motive.") (citing *Jenkins v. Guardian Indus. Corp.,* 16 S.W.3d 431, 441 (Tex. App.—Waco [10th Dist.] 2000, pet. denied)).

Defendants contend Plaintiff cannot make a prima facie case. Specifically, Defendants argue that Plaintiff cannot show that she suffered any adverse employment action. Plaintiff responds the adverse action was termination by constructive discharge.

**1. Constructive Discharge**

Constructive discharge is an involuntary termination of employment; it occurs when working conditions become so intolerable an employee feels compelled to resign. *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975) (citations omitted); *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

> The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Young*, 509 F.2d at 144 *accord Haley v. All. Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004).

Courts analyze constructive discharge claims under an objective standard, looking at the facts of each case to answer: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). In determining whether working conditions were intolerable, courts consider specific events, including:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). "Whether an employee would feel forced to resign is case- and fact-specific," *Haley*, 391 F.3d at 649, but proving constructive discharge is a "high burden," *El-Hajjami v. United Med. Ctrs.*, No. DR-13-CV-070-AM-CW, 2015 U.S. Dist. LEXIS 193119, at *25, 2015 WL 11545025, at *9 (W.D. Tex. Apr. 1, 2015).

Plaintiff maintains that when she returned from FMLA leave and after her workplace injury, Defendants reduced her job responsibilities, assigned her to menial, degrading, and physically painful work, and subjected her to badgering, harassment, and humiliation calculated to encourage her resignation.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Plaintiff and resolving all disputed facts in her favor, the Court finds the following. Plaintiff joined CoreCivic on May 4, 2015. ECF No. 20-2 at 71. She applied for the job on the recommendation of friends who worked at the facility and because she believed she would be a

7

good caretaker of the immigrant women and children who lived at the facility while awaiting immigration court, legal assistance, or deportation. *Id.* at 8-9, 14 (Pl. Dep. 25:18-26:10; 46:5-9). Plaintiff's belief stemmed from her previous work experience, which includes raising five children and serving her church as a youth leader, Sunday school teacher, and events coordinator. *Id*. at 7 (15:21-16:14; 18:18-20:25).

CoreCivic hired Plaintiff as a Resident Supervisor. *Id.* at 71. Resident Supervisors work in a variety of departments including operations, food service, laundry, mail, and cleaning. ECF No. 20-3 at 5 (Rodriguez Dep. 19:13-14). Resident Supervisors are assigned to posts such as housing, recreation, medical, rover, or intake. ECF No. 20-2 at 72. Shortly after she was hired, CoreCivic granted Plaintiff's request to be assigned to intake. *Id.* at 19 (Pl. Dep. 66:8-25). Intake is a critical area; it is a fast-paced environment, encompasses many duties, and requires extensive training. ECF No. 20-3 at 5 (Rodriguez Dep. 129:11-21). Not every employee is trained to work in intake. *Id.*

For the first two years of her employment with CoreCivic, Plaintiff worked primarily in intake. ECF No. 20-2 at 27 (Pl. Dep. 11:13-16). The end of June 2017, Plaintiff took FMLA leave. She returned to work at the end of September 2017. *Id.* at 24 (89:17-21). Upon her return from FMLA Plaintiff should have been returned to intake.[2] ECF No. 20-3 at 17, 29 (Rodriguez Dep. 65:5-10; 113:23-114:5). Plaintiff understood her assignment to intake was permanent and human resources assured Plaintiff that she "was to return to [her] post in intake" but each day

---

[2]

> On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.

29 CFR 825.214

when she reported to intake, her supervisor (Bayreaux) told her go to a different post. ECF No. 20-2 at 17, 26 (Pl. Dep. 58:19-60:9; 94:6-96:6).

On November 2, 2020, Plaintiff injured her neck and shoulder lifting boxes at work. *Id.* at 28-29 (105:12-14; 106:12-14); 97 (Incident Statement). CoreCivic referred Plaintiff to a physician who evaluated her injury, treated her, and cleared her to return to work November 9, 2017, with motion and lifting restrictions. ECF Nos. 20-2 at 98-102; 20-3 at 20 (Rodriguez Dep. 79:6-80:24). When she returned to work, Plaintiff was not returned to her post in intake. Instead, she was posted to rover, medical, recreational, or landscaping. ECF No. 20-1 at 2-3, par. 5. In these posts, Plaintiff lifted and stacked heavy chairs, boxes, lunch trays, trash bags, and bags of clothes even though she was limited to lifting no more than three pounds. *Id.* Lifting these items caused Plaintiff such extreme pain, she spent her lunch hours crying and her evenings doubling up on pain medication and placing hot wraps on her shoulder and neck. *Id.* at 3-4, pars. 7-8. Every time she asked for light duty or work assignments with a lifting maximum of ten pounds, she was denied. *Id.* at 3, par. 5. Her request to be returned to intake was also denied. *Id.* at 2, par. 3.

Shortly after her return, Plaintiff spoke with Chief of Security Ruiz, Ana Macias in HR, and Rodriguez about the situation, including that Bayreaux's sending Plaintiff to other posts felt discriminatory and harassing. ECF No. 20-2 at 112. From the time she was hired, Plaintiff had made it clear that she wanted to work in intake, she worked in intake for more than two years, and now Bayreaux was sending her away to be assigned tasks that were physically excruciating given Plaintiff's injury. *Id.* at 107-112. Rodriguez told Plaintiff that he did not believe that Bayreaux was harassing her and assured Plaintiff that her post in intake was secure. *Id.* at 112. Rodriguez told Plaintiff that Bayreaux did not have the authority to remove Plaintiff from her

post and that he would speak with the master scheduler to ensure that the roster showed she was posted to intake "so there would be no mistake." *Id.* Nonetheless, when Plaintiff reported for her next shift, Bayreaux sent her away from intake, telling Plaintiff that the roster had Plaintiff scheduled to work in another post. *Id.*

Plaintiff spoke with the master scheduler and learned that rather than ensuring that she was assigned to intake, Rodriguez removed her from intake and changed her schedule. *Id.* at 111-112. Plaintiff then filed two incident statements. One asked why—after being posted in intake for more than two years—she had been removed from her post. ECF No. 20-2 at 107-108. The other expressed that she thought she was being treated unfairly. *Id.* 109-110. Both statements noted that Bayreaux applied a different standard depending on the employee doing the work. Some Residential Supervisors were expected to open incoming residents' luggage and inventory the contents, others just tagged the bags and placed them in storage. On November 22, 2017, Plaintiff again spoke with Rodriguez about her concerns. *Id.* at 111. Rodriguez told her that he replaced her because she had taken FMLA. *Id.* at 112. He was also upset with Plaintiff because she gave her November 17 incident statements to Warden Lee rather than turning them into him. By November 22, 2017, Plaintiff was so distressed she took time off work. She filed her final incident statement on November 25, 2017, detailing her concerns, requesting that she be returned to intake or a similar post, and pleading for help. *Id.*

On December 4, 2017, having received no response to her complaints, Plaintiff submitted her two-week notice of resignation via email. ECF No. 20-2 at 36 (Pl. Dep. 134:18-22). She did not want to resign but felt she had no other choice. ECF No. 20-1 at 4, par. 10. Because CoreCivic did not respond to her complaints, Plaintiff believed if she returned to work her supervisors would disregard her assignment to intake, ignore her physical restrictions, assign her

to duties that required her to lift heavy items, be indifferent to her debilitating pain, and mock her if she complained. ECF No. 20-1 at 5, par. 9-11.

Defendant argues that as a matter of law, a plaintiff cannot establish a constructive discharge if she was merely asked to perform her job duties. ECF No. 22 at 3. In support of this argument Defendants point to four district and two appellate cases from around the country.[3] *Id.* at 3-4. These cases do not establish the baseline Defendants seek to impose. As the Fifth Circuit has repeated, a proper constructive discharge analysis is "case- and fact-specific" and considers contributing factors or events, "singly or in combination." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 342 (5th Cir. 2005) (citing *Haley*, 391 F.3d at 649 (citing *Brown*, 237 F.3d at 566)). As explained below, context matters.

Before analyzing Plaintiff's constructive discharge claim, the Court notes that the record contains some conflicting testimony and some testimony that is susceptible to differing interpretations. For example, Plaintiff testified she was not restored to her position in intake after she took FMLA leave and after she was injured on the job. Rodriguez first testified that Plaintiff should have been restored to her titled position, Resident Supervisor. Rodriguez next testified that in light of her two-year tenue in intake, she should have been returned to that post. He later testified that someone who returns from FMLA should be placed back in their job position of Resident Supervisor, which for Plaintiff meant intake.

Defendants argue that Plaintiff does not contend that the posts she was sent to were less prestigious than intake. Taking Plaintiff's testimony as a whole, a reasonable juror could conclude that Plaintiff believed the posts Bayreaux sent her to were less prestigious than intake.

---

[3] *Molina v. Equistar Chems., L.P.*, 2006 U.S. Dist. LEXIS 47075 (S.D. Tex. June 30, 2006); *Melendez v. Bd. of Educ. for Montgomery Cty.*, 2017 U.S. Dist. LEXIS 4714 (D. Md. Jan. 12, 2017); *Hawkins v. Vantage Point Behavioral Health, LLC*, 2014 U.S. Dist. LEXIS 168373 (W.D. Ark. Dec. 2, 2014); *Akande v. Grounds*, 2007 U.S. Dist. LEXIS 78803 (S.D. Ill., Oct. 24, 2007); *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 496 (8th Cir. 1996); *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).

Additionally, Rodriguez testified that intake is a critical area; it is a fast-paced environment, encompasses many duties, and requires such extensive training that not every employee is trained to work there.

There is some disagreement as to the effect of Plaintiff's card being changed from "G" to "D." Defendant argued that this change did not impact Plaintiff's access; it only changed her days off. In testifying about Bayreaux's concerns about Plaintiff's attendance, Rodriguez stated: "So when an employee who's assigned to a critical area like [intake] misses days, is late, you know, things like that, it does affect the operation, because now the captain has to go and find another employee <u>who has the same access that this employee does</u> and is able to do all these duties and responsibilities in there." ECF No. 20-3 at 33 (Rodriguez Dep. 129: 11-21).

Plaintiff testified that when she returned to work after her injury, she was sent to posts where she was required to do tasks that aggravated her injury and caused her extreme pain. On March 3, 2019, Rodriguez testified in deposition that Bayreaux told him about Plaintiff's lifting restrictions but it was "up to HR to communicate with the master scheduler and identify a post that meets those restrictions, because HR is the only one that's privy to the restrictions themselves." ECF No. 20-3 at 18, 20 (Rodriguez Dep. 71:1-13; 80:12-24). Rodriguez also testified that he doesn't pay much attention to employees' medical restrictions—HR notifies the master scheduler and the supervisor—Rodriguez is copied but he just deletes the emails. *Id.* at 15, 21 (59:9-13; 60:6-8; 81:1-82:23). On March 19, 2020, Rodriguez testified by declaration that he helped make the decision to "temporarily" transfer Plaintiff out of intake for her own safety, given her restrictions. ECF No. 16-2 at 5-6, par. 14. His declaration also states that Plaintiff was having attendance issues and that contributed to the decision. It is undisputed Plaintiff had attendance issues (tardiness) in the spring preceding her FMLA leave. There is no evidence in

the record of documented attendance issues after Plaintiff returned from FMLA. *Id.* at 25-26 (99:17-102:18). As evidenced by Plaintiff's November 17, 22, and 25, 2017 Incident Statements and her December 4, 2017 email, any decision that Plaintiff's move from intake was temporary was not communicated to her.

Although the testimony includes some conflicting evidence and incidents susceptible to differing interpretations, these are not sufficient to create a genuine dispute of material fact for trial. Even where there is some alleged factual dispute between the parties, this does not automatically defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. And for the reasons below, the Court cannot conclude that a reasonable jury could return a verdict for Plaintiff.

Considering the summary judgment evidence in the light most favorable to Plaintiff, the Court concludes she has not met her burden to establish constructive discharge. First, because Plaintiff does not establish that any badgering, harassment, or humiliation was severe, pervasive, or calculated to encourage her resignation. Second, the evidence Plaintiff presents regarding the reduction in her job responsibilities and her reassignment to menial or degrading work does not clear the high bar set by the Fifth Circuit.

With respect to Plaintiff's evidence that Bayreaux subjected her to a calculated pattern of harassment, badgering, humiliation, and general mistreatment, the Court finds instructive *Hooker v. Victoria's Secret Stores, Inc.*, in which the Fifth Circuit upheld a constructive discharge verdict where the plaintiff felt that her supervisor treated her more harshly than other workers. 281 F.3d 1278, 2001 WL 1692436, at *3 (5th Cir. 2001) (per curiam).[4] In *Hooker*, co-workers

---

[4] Ordinarily, the Court cites to decisions at the same procedural posture as the case at bar. However, the district court's memorandum opinion and order denying Victoria's Secret's motion for summary judgment is not available

testified that the supervisor was continually "condescending" toward the plaintiff; the supervisor always "sounded so exasperated" when dealing with plaintiff and did not act in the same manner toward other workers; when talking to employees other than plaintiff, the supervisor was "nice", but when talking to plaintiff, the supervisor used a "reprimanding-a-child type" voice; and the "tone of voice that [the supervisor] would use with [the plaintiff] versus everybody else" was so noticeably different that it prompted one employee to start paying closer attention to the relationship between plaintiff and the supervisor and prompted another employee to testify that if she had been treated in the same manner by the supervisor, she "probably would have left." *Id.*

The Court highlights *Hooker* because of the similar allegations. Like Ms. Hooker, Ms. Esquivel felt singled out, belittled, and snubbed by her supervisor. The treatment of Ms. Hooker by the supervisor permeated the workplace. It was so obvious and pervasive other employees felt uncomfortable with the way the supervisor treated Ms. Hooker. Plaintiff argues that Bayreaux treated her differently from and more harshly than other employees and that she felt mocked by Rodriguez when she went to him for help. However, while Plaintiff's evidence demonstrates many failures and missed opportunities to communicate between HR, Rodriguez, Bayreaux, and Plaintiff, the evidence is insufficient to support a finding that Bayreaux's treatment of Plaintiff was severe or pervasive, or that Rodriguez's comments about taking FMLA leave were calculated to encourage Plaintiff's resignation.

With respect to the reduction in Plaintiff's job responsibilities and her reassignment to menial or degrading work, the Court is guided by *Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir. 1991) and *Wheat v. Fla. Par. Juvenile Justice Comm'n.*, 811 F.3d 702 (5th Cir. 2016). In *Wilson*, the employer reassigned the plaintiff—a former "executive manager"—to a position

---

electronically. *See* Case No. 3:99-cv-331-WHB, ECF No. 31 (S.D. Miss. Mar. 14, 2000). And no electronic record (District Court CM/ECF) is available for *Wilson*, cited below.

as "an entry level warehouse supervisor with menial and demeaning duties." *Wilson*, 939 F.2d at 1145. In upholding the verdict, the Fifth Circuit concluded that evidence of constructive discharge had been presented to the jury, which found that the company's conduct was so "extreme and outrageous," it supported a finding of intentional infliction of emotional distress. The Fifth Circuit summarized the evidence this way:

> We find it difficult to conceive a workplace scenario more painful and embarrassing than an executive, indeed a vice-president and the assistant to the president, being subjected before his fellow employees to the most menial janitorial services and duties of cleaning up after entry level employees: the steep downhill push to total humiliation was complete. The evidence, considered as a whole, will fully support the view, which the jury apparently held, that Monarch, unwilling to fire Wilson outright, *intentionally and systematically* set out to humiliate him in the hopes that he would quit. A reasonable jury could have found that this employer conduct was intentional and mean spirited, so severe that it resulted in institutional confinement and treatment for someone with no history of mental problems. Finally, the evidence supports the conclusion that this conduct was, indeed, so outrageous that civilized society should not tolerate it.

*Wilson*, 939 F.2d at 1145 (emphasis in original). In *Wheat*, after years of service, the plaintiff was fired for failing to return at the conclusion of FMLA leave. 811 F.3d at 708. She successfully sought judicial relief to get her job back but when she returned to work, her employer assigned her to janitorial duties for three weeks. The Fifth Circuit concluded the plaintiff had not sufficiently stated "a materially adverse action under *Burlington*[5] or *Wilson*, specifically, because she had not established what was meant by "janitorial" duties, how much time she spent doing the duties, or the degree of humiliation she suffered, "if any." *Id.* at 707.

The *Wheat* opinion distinguished *Wilson* by pointing to evidence that Mr. Wilson "had been a long-time executive" with the employer and was "responsible for the largest project in the company's history," which he completed "on time and under budget"; in his reduced role, he "was frequently required to sweep the warehouse" and "was reduced to cleaning up after the

---

[5] A job reassignment is materially adverse when it involves "dirtier" work, has less "prestige," and is objectively considered a worse job. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006).

employees in the warehouse cafeteria after their lunch hour"; and he "spent 75 percent of his time performing these menial, janitorial duties" under a sign that read "Wilson is old." *Id.*

That prior to her FMLA-related termination Ms. Wheat had served her employer for nine years and, over those years, had been promoted through the ranks—ultimately to Assistant Director of Female Services—while receiving positive reviews and consistent pay raises was not enough to show that being assigned to janitorial duties amounted to a reduction in job responsibilities or was in any way humiliating. *Wheat* concluded that simply alleging an assignment to janitorial duties was not enough to inform the court that the job was a reduction in responsibilities, menial, or degrading. The Court wanted to know, were the janitorial duties "unpleasant" (like cleaning bathrooms) or "minor" (like changing lightbulbs)? How much time was spent doing the tasks, was it all day, five minutes, seventy-five percent of her job? *Id.* at 708. Also, did Plaintiff object to the assignment? *Id.*

The lessons gleaned from *Wilson* and *Wheat* are these: (1) to establish constructive discharge based on a reduction in job responsibilities a plaintiff must show the reduction was a precipitous decline; (2) to establish constructive discharge based on reassignment to menial work a plaintiff must demonstrate that the reassigned work was menial both as compared to the previous work and in the context of the workplace; and (3) degrading work occurs when the degradation is accompanied by severe and very public humiliation. Indeed, these align with the Fifth Circuit's requirement that a constructive discharge claim based on harassment must establish a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992).

On the evidence presented, the Court cannot conclude that the change in Plaintiff's job responsibilities was a precipitous decline from her previous work in intake. While not every

Residential Supervisor could be assigned to intake (because intake required specialized training), it was not unusual for intake personnel to be assigned to other, less prestigious, posts. The Court also cannot conclude that Plaintiff's reassignment was to menial work because all Resident Supervisors pulled weeds, hauled lunch trays, or took out trash from time to time. As to degradation, while Plaintiff's evidence shows she sometimes felt unliked, mocked, or embarrassed, she did not establish that she suffered severe, public humiliation. Finally, Plaintiff's evidence does not establish that Bayreaux or Rodriguez knew her assignments outside of intake subjected her to tasks that violated her restrictions and caused her pain. Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

## C. Interference

29 U.S.C. § 2615(a)(1) prohibits an employer "from interfering with or restraining an employee from exercising, or attempting to exercise, their FMLA rights." An FMLA interference claim requires proof that the employer "interfered with, restrained, or denied" the plaintiff's exercise or attempt to exercise his FMLA rights and that the violation prejudiced him. *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (citation omitted). The term "interference" includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 346 (5th Cir. 2013) (quoting 29 C.F.R. § 825.220(b)).

To make a prima facie case of interference, a plaintiff must show that (1) he was an eligible employee, (2) his employer was subject to the FMLA, (3) he was entitled to FMLA leave, (4) he notified his employer of his intent to take FMLA leave, (5) his employer interfered with his exercise of FMLA rights, and (6) he was prejudiced as a result. *Park v. Direct Energy GP, L.L.C.*, No. 19-20878, 2020 U.S. App. LEXIS 33020, at *9 (5th Cir. 2020) (citing *Tatum v.*

*S. Co. Servs.*, 930 F.3d 709, 713 (5th Cir. 2019); *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

While employed by CoreCivic, Plaintiff requested FMLA, was approved for FMLA, and took FMLA leave. Thus, the record does not support a finding that CoreCivic interfered with Plaintiff's exercise of her FMLA rights.

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' Motion for Summary Judgment (ECF No. 15). Defendants' Objections to Plaintiff's Evidence (ECF No. 23) are sustained in part and overruled as moot in part. This Memorandum Opinion and Order disposes of all claims asserted in this case. Accordingly, the Court issues a final judgment pursuant to Fed. R. Civ. P. 58 contemporaneously herewith.

It is so ORDERED this 14th day of December 2020.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE